# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

JULIE A. MCKINLAY,

      Plaintiff,

vs.

MICHAEL J. ASTRUE,[1]
Commissioner of Social Security,

      Defendant.

No. C06-1009

**RULING ON REQUEST FOR
JUDICIAL REVIEW**

_____

*I.*  *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*II.*  *PRIOR PROCEEDINGS* . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*III.*  *PRINCIPLES OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . 4

*IV.*  *FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    *A.*  *Testimony of McKinlay and Vocational Experts* . . . . . . . . . . 5
    *B.*  *McKinlay's Medical History* . . . . . . . . . . . . . . . . . . . . . 7
        *1.*  *Overview* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        *2.*  *Treating and consulting sources* . . . . . . . . . . . . . . . 8
    *C.*  *Other Testimony* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*V.*  *CONCLUSIONS OF LAW* . . . . . . . . . . . . . . . . . . . . . . . . . 13
    *A.*  *ALJ's Disability Determination* . . . . . . . . . . . . . . . . . 13
    *B.*  *McKinlay's Residual Functional Capacity* . . . . . . . . . . . . 15
        *1.*  *Opinions of treating and examining physicians* . . . . . . . . . . . 16
        *2.*  *Credibility determinations* . . . . . . . . . . . . . . . . . . . . 22

*VI.*  *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

_____

[1] This case was filed originally against Jo Anne B. Barnhart, who was at that time Commissioner of the Social Security Administration (SSA). On February 12, 2007, Michael J. Astrue became Commissioner of the SSA, and he hereby is substituted as the defendant in this action. *See Fed. R. Civ. P. 25*(d)(1).

## I. INTRODUCTION

This matter comes before the Court on Plaintiff Julie A. McKinlay's request for judicial review of the Social Security Commissioner's decision to deny her application for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits (docket number 1) filed on March 16, 2006. McKinlay asks the court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, McKinlay requests remand with directions to conduct a new hearing. Finding no error in the Commissioner's decision, the court shall affirm.

## II. PRIOR PROCEEDINGS

McKinlay applied for SSI benefits on October 29, 2001, alleging an inability to work since November 1, 2000, due to low back and knee problems.[2] Specifically, McKinlay reported that her alleged disabilities limit her ability to work because she requires special accommodations for her impairments, including the ability to alternate positions between sitting and standing and the opportunity to take additional rest break throughout her work period. McKinlay's application was denied on January 24, 2002. On April 9, 2002, her application was also denied on reconsideration. On June 11, 2002, McKinlay requested a hearing before an Administrative Law Judge ("ALJ"). On August 19, 2003, McKinlay appeared with counsel, via video conference, before ALJ Jean M. Ingrassia for an evidentiary hearing. McKinlay and vocational expert Jeff L. Johnson testified at the hearing. In a decision dated October 28, 2003, the ALJ denied McKinlay's claim. The ALJ determined that McKinlay was not disabled and was not entitled to SSI

---

[2] McKinlay worked approximately 15 hours per week at Saint Vincent De Paul Store from February 18, 2002 until December 29, 2004. McKinlay sorted, priced, and placed jewelry, puzzles, games, watches, and other miscellaneous items on display inside the store. In her July 29, 2005 decision, the Administrative Law Judge concluded that McKinlay had "not engaged in substantial gainful activity at any time pertinent to this decision."

benefits because she was functionally capable of performing work that exists in significant numbers in the national economy.

McKinlay appealed the ALJ's decision. On September 23, 2004, the Appeals Council vacated the ALJ's October 28, 2003 decision and remanded the case for further consideration. While McKinlay's request for review was pending, she filed a subsequent application for SSI benefits on April 8, 2004 and an application for a period of disability and disability insurance benefits on June 4, 2004. The Appeals Council ordered the ALJ to adjudicate these applications as well on remand. On April 28, 2005, McKinlay appeared with counsel, via video conference, before ALJ Ingrassia for an additional evidentiary hearing. McKinlay and vocational expert Roger F. Marquardt testified at the second hearing. In a decision dated July 29, 2005, the ALJ again denied McKinlay's claim. The ALJ determined that McKinlay was not disabled and was not entitled to a period of disability, disability insurance benefits, or SSI benefits because she was functionally capable of performing work that exists in significant numbers in the national economy. On January 19, 2006, the Appeals Council denied McKinlay's request for review. Consequently, the ALJ's July 29, 2005 decision was adopted as the Commissioner's final decision.

On March 16, 2006, McKinlay filed this action for judicial review. The Commissioner filed an answer on September 19, 2006. On November 19, 2006, McKinlay filed a brief arguing there is not substantial evidence in the record to support the finding that she is not disabled and has the functional ability to perform work. On January 18, 2007, the Commissioner filed a responsive brief arguing the ALJ's decision was correct and asking the court to affirm the ALJ's decision. On March 26, 2007, both parties consented to proceed before the undersigned in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following a hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3) the Commissioner's final determination after a hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides the court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." *Id.*

The court must consider "whether the ALJ's decision is supported by substantial evidence on the record as a whole." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citing *Harris v. Barnhart*, 356 F.3d 926, 928 (8th Cir. 2004)). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Id.* (citing *Suttan v. Barnhart*, 368 F.3d 857, 862 (8th Cir. 2004)). Furthermore, "substantial evidence is 'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (quoting *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)).

In determining whether the ALJ's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but [does] not re-weigh the evidence." *Vester*, 416 F.3d at 889 (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). The court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Guilliams*, 393 F.3d at 801. "[E]ven if inconsistent conclusions may be drawn from the evidence, the agency's decision will be

upheld if it is supported by substantial evidence on the record as a whole." *Id.* (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)).

## IV. FACTS

### A. Testimony of McKinlay and Vocational Experts

McKinlay was born on July 23, 1966 and has earned her GED. Prior to her alleged disability date of November 1, 2000, McKinlay was employed as a work supervisor, cleaning buildings, for a janitorial service. McKinlay injured her back while working for the janitorial service.[3] She could not continue her employment because she was unable to perform her work duties after her injury. In February 2002, McKinlay began working approximately 15 hours per week at St. Vincent De Paul Store. She sorted, priced, and placed jewelry, puzzles, games, watches, and other miscellaneous items on display inside the store.

At the August 19, 2003 administrative hearing, McKinlay testified that her husband[4] and sons[5] do most of the household chores, including laundry. She testified that she does most of the cooking, but sometimes receives help from members of her family. She further testified that when she returns home after working for five hours at St. Vincent De Paul Store, she generally sits in a recliner or lounges on a couch reading a book and stretching out her back. McKinlay also testified that she takes naprosyn or ibuprofen for her back and knee pain.

---

[3] McKinlay asserts that she suffered her injury because her employer did not supply her with a full work crew; and therefore, she was forced to "continuously" overwork herself. Additionally, McKinlay filed a worker's compensation claim as a result of her injury. She settled the claim in 2000.

[4] At the second administrative hearing on April 28, 2005, McKinlay testified that a couple of weeks before the hearing, her husband, Mark McKinlay, ceased living with her and their sons and told her he wanted a divorce.

[5] McKinlay has three sons who were ages 19, 15, and 13 at the time of the first hearing. Mr. McKinlay was the father of the two youngest sons. Her oldest son had moved to Texas to live with his biological father at the time of the first hearing.

McKinlay's husband also testified at the August 19, 2003 hearing. Mr. McKinlay testified that, except for cooking, he and their children do all of the household chores. Mr. McKinlay also testified that that his wife no longer hunts with him, goes boating, rides motorcycles, goes horseback riding, or goes hiking anymore. Mr. McKinlay further testified that on days McKinlay works at St. Vincent De Paul Store, she returns home and lays down on the couch for a few hours, and then gets up to make dinner. He testified that after dinner, she returns to the couch and watches T.V. until they go to bed. Mr. McKinlay testified that she no longer sleeps all night.

Vocational expert Jeff Johnson also testified at the August 19, 2003 hearing. The ALJ provided Johnson with the following hypothetical:

> [W]e're looking at a 38 year old with a GED and consistently all the RFC assessments have limited her to light work, occasional lifting of 20 pounds, frequent lifting of ten with the latitude to alternate between sitting and standing at least every hour but able to do this during an eight hour day. Her primary limitations would be climbing and especially, you know, when walking up hill which seems to put a lot of pressure on her knees and her back. Frequent bending should be limited, I mean, she should be limited to occasional bending, occasional stooping, crouching, and crawling. She has no manipulative visual, communicative, environmental limitations. And she's able to stand and walk with normal breaks.

Using the ALJ's hypothetical, Johnson testified that there were about 3,000 light unskilled jobs and 800 light and sedentary jobs in Iowa which someone fitting the hypothetical could do. These jobs included bench assembler, office helper, and cafeteria cashier.

On April 28, 2005, McKinlay testified at her second administrative hearing. McKinlay testified that she stopped working at St. Vincent De Paul Store on December 29, 2004. McKinley further testified that she was looking for work at department stores, grocery stores, and gas stations. She also testified that she tries to do work around her house, including dishwashing, vacuuming, and dusting. She testified that she could do housework for 10 minutes at a time. McKinlay testified that she has difficulty going up and down the stairs in her home. She testified that it is especially difficult to use the stairs

to her basement and therefore she rarely goes into her basement. She testified that she could drive a car. She testified that her hobbies included reading and watching movies. She also testified that she takes naprosyn and Darvocet for pain medication.

Vocational expert Roger Marquardt also testified at the April 28, 2005 hearing. The ALJ asked Marquardt to provide an assessment of McKinlay's work capabilities based on the following:

> The knee problems of course would be an added dimension to your profile and it would appear that you should be able to stand two hours in an eight hour day. Again because we [are] adding this restriction of the knee problem to those other restrictions. You have no communicative limitations, you don't appear to have any environmental limitations. Your postural limitations would be occasional climbing, balancing, stooping, kneeling, crouching and crawling. You have no manipulative or visual limitations. So with the two combined limitations from the functional capacity assessment in June 2000 and the added restrictions caused by your knee problems, I am going to ask . . . [the] vocational expert whether the claimant is capable of performing her past work with those restrictions. She's the younger individual between the ages of 35-38 and she has a GED certificate.

Based on the factors provided by the ALJ, Marquardt concluded that McKinlay could work as a stock clerk, office machine operator, or library aide. Marquardt testified that there were 19,950 such jobs in Iowa.

### B. McKinlay's Medical History

#### 1. Overview

McKinlay has been diagnosed with degenerative disc disease and a history of herniated discs at the L4-5 section of her back. McKinlay has undergone two surgical procedures on her back. She had a L4-5 discectomy on September 15, 1994 and a L4-5 partial laminectomy, discectomy, and decompression in May 1998.[6] She also suffers from

---

[6] The September 15, 1994 surgery was performed in Idaho Falls, Idaho. Medical records regarding this surgery are not provided in the record before the court. In fact, no
(continued...)

residual left-sided radiculopathy due to scar tissue formation, degenerative disc disease in her cervical spine, and degenerative joint disease in her knees bilaterally. McKinlay has also undergone two knee surgeries. She had right knee arthroscopic surgery on March 24, 2003 and left knee arthroscopic surgery on November 17, 2003.

### 2. *Treating and consulting sources*

From September 11, 1995 through March 31, 1999, McKinlay was treated by Dr. Stephen Pierotti, an orthopaedic surgeon, for back and leg pain. On September 11, 1995, Dr. Pierotti diagnosed McKinlay with a lumbar strain and sought to treat it through physical therapy. McKinlay returned one month later and showed improved motion and manageable pain in her back. Dr. Pierotti had her continue physical therapy.

On May 23, 1996, McKinlay returned to Dr. Pierotti and complained of pain in both of her knees. Dr. Pierotti examined both of McKinlay's knees and found no evidence of any injuries. X-Rays of her knees showed no significant arthritis or any other changes. However, Dr. Pierotti opined that she might have some loose bodies in her right knee. Dr. Pierotti treated McKinlay with straight leg raises and quadriceps strengthening exercises and stretching.

Dr. Pierotti did not see McKinlay for approximately 21 months. On February 4, 1998, McKinlay went to see Dr. Pierotti due to complaints about pain in her back and left leg. Dr. Pierotti performed an examination and determined that she was neurologically

---

[6](...continued)
medical records for McKinlay prior to September 11, 1995 are included in the record. In his patient notes dated September 11, 1995, Dr. Pierotti, McKinlay's treating physician in Dubuque, Iowa, from September 11, 1995 through March 31, 1999, included the following information regarding McKinlay's 1994 back surgery:

> She does have a history of having a L4-5 disc removed in Idaho done almost exactly a year ago. At that time she did have no injury but she had alot of pain in her back radiating down her left leg. Surgery was performed and she had excellent results with this, meaning her left leg pain was gone.

(Record 207)

intact in the lower leg.  He also determined that straight leg raising was negative for leg pain; however, it increased the pain in her back.  Dr. Pierotti also found negative pain with rotation of the hips.  X-rays were normal except for some L4-5 arthritis which was present on previous examinations.  Dr. Pierotti proposed to treat McKinlay's pain with physical therapy.

McKinlay returned to Dr. Pierotti on February 16, 1998, March 11, 1998, and March 25, 1998 with continued back and left leg pain.  Dr. Pierotti continued to treat McKinlay with physical therapy.  After her March 25, 1998 visit, Dr. Pierotti determined that disc excision surgery would be an appropriate treatment option for McKinlay.  On May 8, 1998, McKinlay had surgery on her back.  Specifically, she underwent a partial laminectomy, discectomy, and decompression of the nerve L4-5 on her left side.

Following the surgery, McKinlay met with Dr. Pierotti on several occasions.  For the first four months following surgery, the pain in McKinlay's back and left leg resolved slowly.  McKinlay saw Dr. Pierotti on September 30, 1998, and indicated that her back and leg were starting to feel better.  Dr. Pierotti concluded that McKinlay had "finally turned the corner and [was] recovering and having less pain."  Dr. Pierotti saw McKinlay again on October 28, 1998.  McKinlay indicated that most of her back and leg pain had been resolved and she only had some intermittent leg achiness.  Dr. Pierotti concluded that she had healed enough over the past five months to be able to return to work.  Dr. Pierotti indicated that McKinlay needed to be careful with bending, stooping, and lifting when she returned to work.  McKinlay and Dr. Pierotti met again on February 17, 1999.  McKinlay continued to have intermittent pain in her left leg.  Dr. Pierotti recommended that she seek a second opinion from the Spinal Clinic in Iowa City.  On March 31, 1999, McKinlay saw Dr. Pierotti and nothing had changed since her previous visit on February 17, 1999.  Dr. Pierotti again urged McKinlay to seek a second opinion from the Spinal Clinic in Iowa City.

McKinlay met with Dr. Ernest M. Found, Jr., M.D. from the Orthopaedics Department at the University of Iowa Hospitals and Clinics on March 1, 2000.  Upon

9

examination, Dr. Found determined that McKinlay had difficulty squatting, normal heel and toe walk, limited range of motion, and mildly positive straight leg raise for pain on her left leg. Dr. Found concluded McKinlay was not a candidate for surgery at that time and recommended that she continue with exercise and rehabilitation.

On April 6, 2000, McKinlay was examined by Dr. Steven M. Olsen, an occupational physician. Dr. Olsen was selected by McKinlay's employer to examine her in conjunction with a worker's compensation claim she had filed. Following his examination, Dr. Olsen diagnosed McKinlay with "radiculopathy secondary to post-surgical scarring." Dr. Olsen also concluded that she had a 10 percent impairment of the whole person. Dr. Olsen suggested the following restrictions for her: (1) She may not perform repetitive bending below the knee, (2) may perform "occasional" stooping to knee height, (3) may perform "frequent" squatting of 20 successive repetitions, (4) may perform "occasional" crouching, approximately 90 seconds in duration, (5) is capable of "frequent" reaching, handling, and fingering at above waist to overhead level, (6) may "occasionally" lift 20 pounds from knee to waist height, (7) may "occasionally" lift 20 pounds from waist to above shoulder height, (8) may "occasionally" carry 20 pounds for a distance of 20 feet, and (9) may push/pull a wheeled cart weighing 250 pounds.

On December 14, 2001, McKinlay, at the request of Disability Determination Services ("DDS"), received a consultative examination by Dr. Peggy Mulderig. Dr. Mulderig concluded McKinlay suffered from "failed back syndrome" with chronic low back pain, radicular symptoms related to scar formation, and possibly depression. Dr. Mulderig also suggested the following work restrictions for McKinlay:

> [T]he patient would be able to lift and carry up to 20 pounds.
> By patient's description, she is able to stand for approximately
> one hour and sit for approximately one hour. Ideally during
> a day she would be able to do frequent position changes ad lib.
> . . . [S]he has difficulty with pain when walking uphill. The
> patient does not appear today to be limited in regard to
> stooping, climbing, kneeling, or crawling. No limitations with
> handling objects, seeing, hearing speaking, or traveling.

Case 2:06-cv-01009-JSS   Document 21   Filed 04/11/07   Page 10 of 26

Dr. J.D. Wilson, M.D., a state agency medical consultant, reviewed McKinlay's medical history and Dr. Mulderig's assessment of her and filed his own assessment on January 22, 2002. Dr. Wilson asserted McKinlay could carry up to 20 pounds occasionally and 10 pounds frequently. Dr. Wilson determined McKinlay could sit for a total of about six hours in an eight-hour day with normal breaks. Dr. Wilson further determined that McKinlay could stand or walk for a total of about two hours in an eight-hour day with normal breaks. Dr. Wilson also determined that McKinlay could occasionally climb, balance, stoop, kneel, crouch, or crawl. Dr. John A. May, also a state agency medical consultant, affirmed Dr. Wilson's assessment as written on April 5, 2002.

On November 19, 2002, McKinlay sought treatment from Dr. R. Scott Cairns, M.D., an orthopaedic surgeon, for neck pain and occasional tingling in her right arm. X-rays showed "fairly significant" degenerative changes at C-5, 6 and 6, 7. An MRI was taken on November 25, 2002. The MRI showed some degenerative changes at C-5, 6 and 6, 7. However, Dr. Cairns did not see a surgical lesion in that area. Dr. Cairns recommended physical therapy for treatment. At her January 20, 2003 visit, Dr. Cairns noted that physical therapy had helped McKinlay considerably.

On March 7, 2003, McKinlay visited Dr. Cairns complaining of pain in her knees. McKinlay complained of greater pain in her right knee. X-rays showed "fairly significant" degenerative changes laterally, especially on the right side. The X-ray showed some loose bodies as well. Dr. Cairns performed arthroscopic surgery on McKinlay's right knee on March 24, 2003. On July 10, 2003, McKinlay returned to Dr. Cairns complaining of pain in her left knee. Between July 24, 2003 and November 13, 2003, McKinlay had several X-rays and MRIs which showed degenerative changes in the lateral tibial surface of her left knee. Dr. Cairns performed arthroscopic surgery on McKinlay's left knee on November 17, 2003.

On September 4, 2003, Dr. Cairns completed a disability report for McKinlay. In the report, Dr. Cairns stated McKinlay had back pain, neck pain when looking down, and knee pain when walking. Dr. Cairns further stated that McKinlay could tolerate a

moderate amount of work-related stress. Dr. Cairns opined that McKinlay could sit for 30 minutes at a time, stand for 15 minutes at a time, and walk one block at a time. Dr. Cairns also asserted that McKinlay could stand or walk for a total of about two hours in an eight-hour day and sit for a total of about two hours in an eight-hour day. Dr. Cairns further stated that she would need to walk around for five minutes every 30 minutes. Dr. Cairns also stated that she would need to alternate between standing and sitting at will. Dr. Cairns asserted that she would need to lie down for 30 minutes at a time for three to four hours everyday. Dr. Cairns further asserted that McKinlay could lift and carry up to 20 pounds. Dr. Cairns also stated that she could frequently reach and occasionally bend, but could not squat or climb.

In a letter dated June 6, 2005, Dr. Cairns addressed questions regarding his earlier assessments of McKinlay's capability of completing an eight-hour workday. In the letter, Dr. Cairns asserted that McKinlay "could complete the eight-hour workday, assuming a suitable position with periods of sitting and periods of standing were available." Dr. Cairns further stated:

> The medical basis is that she has significant degenerative arthritis in her knee. This would give her difficulties with long standing, walking, and climbing. She has spinal difficulties having difficulty with long sitting and certainly would have trouble with bending or lifting.

On August 6, 2004, Dr. Mulderig evaluated McKinlay for a second time in conjunction with her subsequent application before DDS. Dr. Mulderig diagnosed McKinlay with chronic low back pain with chronic left lower extremity radiculopathy, chronic neck pain, and chronic knee pain. Dr. Mulderig concluded that McKinlay should be limited to lifting 10 pounds. Dr. Mulderig also noted that McKinlay's self-reported ability to stand, move about, or walk was 30 minutes per hour, and she found McKinlay's self-report to be "conceivable." Dr. Mulderig also concluded that McKinlay was able to sit for 30 minutes per hour. Dr. Mulderig further determined that McKinlay should be

limited in stooping, climbing, kneeling, and crawling. Dr. Mulderig also noted that McKinlay was not limited with handling objects, seeing, hearing, speaking, or traveling.

At the request of DDS, Dr. Wilson reviewed McKinlay's medical file for a second time on September 11, 2004. Dr. Wilson concluded McKinlay could lift and carry up to 10 pounds occasionally or frequently. Dr. Wilson also determined that McKinlay could sit for a total of about six hours in an eight-hour day with normal breaks and stand or walk for a total of about two hours in an eight-hour day with normal breaks. Dr. Wilson further determined that she could occasionally climb, balance, stoop, kneel, crouch, or crawl.

### C. Other Testimony

On August 19, 2003, Sharla Van Cleve, McKinlay's supervisor at St. Vincent De Paul Store, provided a "Declaration" pursuant to 28 U.S.C. § 1746. In this "Declaration," Van Cleve described her observations of McKinlay's experience with back and leg pain. Van Cleve stated that McKinlay had difficulty working 15 hours per week and struggled with pain in her back and legs. Furthermore, Van Cleve opined that McKinlay could not have worked more than 15 hours per week because of the pain. Van Cleve explained that St. Vincent De Paul Store accommodated McKinlay by allowing her to take breaks whenever she needed them, change work duties as needed, and to move positions from sitting to standing to walking in order to ease her pain. Van Cleve also stated that McKinlay took at least two breaks during a five-hour workday. Van Cleve further stated that she observed McKinlay to frequently be in pain. Van Cleve also noted that since McKinlay started employment, her issues with pain became worse and her condition deteriorated. Lastly, Van Cleve stated that McKinlay missed days from work because of her pain, but she tried very hard not to miss any work due to the pain.

### V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that McKinlay is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)-(f); *Bowen v. Yuckert*, 482 U.S. 137, 140

(1987); *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003). The five steps an ALJ must consider are:

> (1)[W]hether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004)); *see also* 20 C.F.R. 404.1520(a)-(f). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Eichelberger*, 390 F.3d at 590-91 (citing *Ramirez v. Barnhart*, 292 F.3d 576, 580 (8th Cir. 2002)).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he [or she] is unable to perform his [or her] past relevant work." *Frankl v. Shalala*, 47 F.3d 935, 937 (8th Cir. 1995) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id.* The RFC is the most an individual can do despite the combined effect of all of their credible limitations. 20 C.F.R. § 416.945. "It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his [or her] limitations." *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001)).

The ALJ applied the first step of the analysis and determined that McKinlay had not engaged in substantial gainful activity since her alleged onset date, November 1, 2000. At the second step, the ALJ concluded, from the medical evidence, that McKinlay had the following severe impairments:

> [D]egenerative disc disease and a history of herniated discs at
> L4-5, status post a L4-5 discectomy on September 15, 1994,
> and a L4-5 partial laminectomy, discectomy, and
> decompression in May 1998, with residual left-sided
> radiculopathy due to scar tissue formation; degenerative disc
> disease in her cervical spine; degenerative joint disease in her
> knees bilaterally, status post right knee arthroscopic surgery on
> March 24, 2003, and left knee arthroscopic surgery on
> November 17, 2003, and obesity.

At the third step, the ALJ found that McKinlay "[did] not have an impairment or

combination of impairments listed in, or medically equal to one  listed in Appendix 1,

Subpart P, Regulations No. 4." At the fourth step, the ALJ determined McKinlay's RFC

as follows:

> The claimant retains the residual functional capacity to lift and
> carry up to 20 pounds occasionally and ten pounds frequently.
> She must be able to alternate between sitting and standing or
> walking, but should be able to accomplish this within a normal
> break schedule. She can sit for a total of about six hours in an
> eight-hour day with normal breaks. She can stand or walk for
> a total of about two hours in an eight-hour day with normal
> breaks. She can occasionally climb, balance, stoop, crouch,
> kneel, or crawl.

Using this RFC, the ALJ determined that McKinlay met her burden of proof at the fourth

step, because she was unable to perform her past relevant work. However, at the fifth step,

the ALJ determined that McKinlay, based on her age, education, previous work experience,

and RFC, could work at jobs that exist in significant numbers in the national economy.

Therefore, the ALJ concluded McKinlay was "not disabled."

### B. McKinlay's Residual Functional Capacity

McKinlay alleges that the ALJ erred in several respects. She argues that the ALJ

erred in determining her RFC because the ALJ failed to give proper weight to the opinions

of her treating and examining physicians. McKinlay also contends that the ALJ failed to

properly evaluate the credibility of her subjective complaints of pain and erred in

discrediting the statements of her witness. Thus, McKinlay asserts that the ALJ's

assessment of her RFC was not supported by substantial evidence. McKinlay requests that the court reverse the Commissioner's decision and remand it with directions to award benefits. Alternatively, McKinlay "requests remand with directions to conduct a new hearing." The Commissioner argues that, after considering all of the relevant evidence, including medical records, observations of treating physicians and others, and McKinlay's own description of her limitations, the ALJ properly evaluated the medical opinion evidence, properly assessed the credibility of McKinlay's subjective complaints, and properly determined McKinlay's RFC. Thus, the Commissioner asserts that the ALJ's decision should be affirmed.

### 1. *Opinions of treating and examining physicians*

McKinlay argues that the ALJ did not properly consider the opinion of Dr. Cairns, her treating specialist for approximately three years. McKinlay maintains that Dr. Cairns' opinion was entitled to controlling weight because he was her "treating specialist with a longitudinal record of treatment." McKinlay further contends that the ALJ's rejection of Dr. Mulderig's opinion that McKinlay be limited to sitting 30 minutes per hour is not supported by substantial evidence. Specifically, McKinlay argues "[t]he ALJ essentially disagrees with the medical judgment of Dr. Mulderig without any basis in substantial evidence for doing so." The Commissioner replies that the ALJ properly determined that the opinions of Drs. Cairns and Mulderig were entitled to little or limited weight based on numerous inconsistencies in the record as a whole. The Commissioner further contends that substantial evidence supports the ALJ's assessment of the medical opinions.

The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). The regulations provide that the longer the treating relationship between a physician and a patient, the more

Case 2:06-cv-01009-JSS   Document 21   Filed 04/11/07   Page 16 of 26

weight should be given to that treating physician's medical opinions. *See* 20 C.F.R. § 404.1527(d)(2)(I). Furthermore, an ALJ is "encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." *Singh*, 222 F.3d at 452. The regulations require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id.* "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

When a consulting physician only examines a claimant once, his or her opinion generally does not constitute "substantial evidence." *Anderson*, 344 F.3d at 812; *see also Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) ("The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence."). An ALJ's decision to credit a one-time consulting physician's opinion and discount a treating physician's opinion should only be upheld under two exceptions to the general rule: "'(1) where [the one-time] medical assessments are supported by better or more thorough medical evidence, or (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" *Anderson*, 344 F.3d at 812-13 (quoting *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000)).

After the first hearing, held on August 19, 2003, the ALJ concluded, based on the consultative examinations of Dr. Olsen performed on April 6, 2000 and Dr. Mulderig performed on December 14, 2001, that the following limitations should be imposed on McKinlay:

> [She] can lift no more than 20 pounds occasionally and 10 pounds frequently; must be permitted to alternate sitting and standing as frequently as every hour; can do no climbing or uphill walking; and can no more than occasionally bend, stoop, crouch or crawl.

After the second hearing, held on April 28, 2005, the ALJ concluded, based primarily on the assessments of Dr. Wilson after his review of McKinlay's medical records, filed on January 22, 2002 and September 11, 2004, that McKinlay had a RFC:

> [T]o lift and carry up to 20 pounds occasionally and ten pounds frequently. She must be able to alternate between sitting and standing or walking, but should be able to accomplish this within a normal break schedule. She can sit for a total of about six hours in an eight-hour day with normal breaks. She can stand or walk for a total of about two hours in an eight-hour day with normal breaks. She can occasionally climb, balance, stoop, crouch, kneel, or crawl.

The ALJ's determinations following the second hearing conflict with the determinations drawn by Dr. Cairns' September 4, 2003 disability report and Dr. Mulderig's second examination of McKinlay performed on August 6, 2004.

Dr. Cairns' report provided that McKinlay: (1) could walk one city block without rest or severe pain, (2) could sit for 30 minutes before needing to get up, (3) could stand for 15 minutes before needing to sit down or walk around, (4) could sit for about two hours and could stand/walk for about two hours in an eight-hour working day with normal breaks, (5) should walk for 5 minutes every 30 minutes during an eight-hour working day, (6) needs a job which allows her to shift positions at will from sitting, standing, or walking, (7) may need to take 5 minute unscheduled breaks every 30 minutes during an eight-hour working day, (8) may have to lie down three to four hours total for 30 minutes at a time during the day, (9) may occasionally lift and/or carry items weighing 20 pounds or less

during an eight-hour workday, and (10) may occasionally bend, never squat or climb, and frequently reach during an eight-hour workday.[7] Dr. Mulderig concluded from her second examination of McKinlay that she: (1) should be limited to lifting and/or carrying 10 pounds, (2) has the ability to stand, walk, or move about for 30 minutes per hour, (3) has the ability to sit for 30 minutes per hour, and (4) should be limited in stooping, climbing, kneeling, and crawling.

The ALJ found that the opinions of Dr. Cairns and Dr. Mulderig were entitled to limited weight for determining McKinlay's RFC. Specifically, the ALJ found Dr. Cairns opinion to be:

> inconsistent with the opinions of the other physicians who examined or evaluated the claimant's impairments. Second, the objective medical evidence does not support the extreme limitations provided in his opinion. Third, his opinion was rendered during the time period when the claimant was recovering from the right knee surgery, and before she had the left knee surgery. The Claimant would have more work-related limitations during this time period than she would have once she had fully recovered from the surgeries. Finally, his June 6, 2005 opinion directly contradicts his September 2003 opinion.

With regard to Dr. Cairns June 6, 2005 letter, the ALJ determined that it was also entitled to limited weight because the letter and the September 2003 report provided contradictory opinions. Specifically, the ALJ stated:

> In his September 2003 opinion, he stated that the claimant could sit, stand, or walk for at total of four hours in an eight-hour day. He also stated the claimant would have to lie down for three to four hours each day. However, in his June 2005 opinion, he stated that the claimant could work an eight-hour day, which she obviously could not if his September 2003 limitations were accepted.

---

[7] In a letter dated June 6, 2005, Dr. Cairns addressed this report and clarified that McKinlay "could complete the eight-hour workday, assuming a suitable position with periods of sitting and periods of standing were available."

The ALJ found Dr. Mulderig's opinion to be entitled to limited weight because:

> Dr. Mulderig based her opinion regarding the claimant's
> limitations in sitting, standing, and walking on the claimant's
> self-report. Although Dr. Mulderig believed that the claimant's
> self-reported limitations were reasonable, there is nothing in the
> record to indicate that the claimant's low back problems have
> worsened since the June 2000 functional capacity assessment.
> Accordingly, there is no reason to believe that the claimant
> cannot still lift and carry up to 20 pounds. On the contrary,
> Dr. Mulderig found that the claimant had normal neurological
> findings in her left lower extremity, and normal strength in both
> lower extremities. Although the claimant has significant
> degenerative joint disease in her knees, her knee symptoms
> improved somewhat as a result of the surgeries. The most
> recent X-rays indicated that the degenerative joint disease in her
> knees had not worsened. Although the claimant has significant
> limitations in her ability to stand or walk, there is nothing in the
> clinical record to indicate that she could not stand or walk for
> a total of at least two hours in an eight-hour day with normal
> breaks.

The ALJ determined that the opinions provided by Dr. Wilson were entitled to some
weight. The ALJ found nothing in the record indicating that McKinlay's low back problem
had worsened since the functional capacity assessment done by Dr. Olsen on April 6, 2000.
The ALJ also noted that McKinlay's knees have not worsened since her arthroscopic
surgeries and even showed improvement directly following the surgeries. The ALJ further
noted that McKinlay's lower extremities show normal strength and normal neurological
findings. Presumably, the ALJ is asserting that Dr. Wilson's opinions deserve greater
weight because they are more consistent with McKinlay's medical records[8] as a whole than
the opinions of Dr. Cairn and Dr. Mulderig which she found to contain inconsistencies.

The record supports the ALJ's conclusion that Dr. Cairns offered inconsistent
opinions regarding McKinlay's RFC. Dr. Cairns disability report indicated that McKinlay
could sit for about two hours in an eight-hour workday and stand/walk for about two hours

---

[8] The ALJ considers the consistency between Dr. Wilson's opinions and
Dr. Olesen's April 6, 2000 opinion to be significant.

in an eight-hour workday. Dr. Cairns report also indicated that McKinlay would have to lie down for 3-4 hours during the day. Under such limitations, McKinlay could not work an eight-hour day. However, Dr. Cairns' June 6, 2005 letter indicates that he believes McKinlay could work an eight-hour day if "periods of sitting and periods of standing were available." Based on these inconsistencies, the ALJ could properly discount Dr. Cairns' opinions. *See Prosch*, 201 F.3d at 1013 (explaining that an ALJ may discount or disregard an opinion, if the treating physician has offered inconsistent opinions).

Furthermore, the record contains medical evidence which shows McKinlay's neck pain and back pain was controlled by proper exercise and medication. The record also shows that McKinlay's knee pain was helped by her arthroscopic surgeries and did not worsen after the surgeries. Therefore, the ALJ could properly give weight to Dr. Wilson's opinions because they provided a consistent RFC between 2002 and 2004 even though McKinlay complained of neck and knee pain between those dates. *See Anderson*, 344 F.3d at 812-13 (explaining when a consulting physician's opinion should be credited and a treating physician's opinion should be discredited based on the consulting physician's opinion being supported by better or more thorough medical evidence or the treating physician offering inconsistent opinions that undermine his or her credibility). Lastly, the ALJ could properly discredit Dr. Mulderig's opinion because she based her findings on McKinlay's ability to sit or walk for 30 minutes per hour on McKinlay's own self-report about her abilities and pain. *See Woolf v. Shalala*, 3 F.3d 1210, 1214 (8th Cir. 1993) (an ALJ can properly discredit a medical opinion when it is based on incomplete medical evidence and relies on patient's complaints of pain).

The court finds that the ALJ considered all of the relevant evidence in this case, including the medical records of McKinlay's treating and consulting sources. The ALJ's determination that the opinions of Dr. Cairns and Dr. Mulderig should be given less weight than the opinions of Dr. Olsen and Dr. Wilson is supported by substantial evidence. Even though inconsistent conclusions could be drawn from this record, the court upholds the

conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 2. Credibility determinations

An ALJ is required to make a credibility determination prior to making his or her RFC determination. *See Tellez*, 403 F.3d at 957. McKinlay argues that the ALJ improperly rejected her subjective complaints of pain and improperly discredited the testimony of her witness, Sharla Van Cleve. The Commissioner argues that the ALJ properly found McKinlay's complaints not credible by following the framework set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), and the regulations at 20 C.F.R. § 404.1529.

When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support them." *Polaski*, 739 F.2d at 1322. However, the absence of objective medical evidence to support a claimant's subjective complaints is a relevant factor for an ALJ to consider. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citation omitted). "The [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Id*. Subjective complaints may be discounted if inconsistencies exist in the evidence as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006) (citing *Polaski*, 739 F.2d at 1322). However, the ALJ must give reasons for discrediting the claimant. *Pelkey*, 433 F.3d at 578 (citing *Strongson*, 361 F.3d at 1072). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Guilliams*, 393 F.3d at 801 (explaining that deference to an ALJ's

credibility determination is warranted if the determination is supported by good reasons and substantial evidence).

In finding McKinlay's allegation of total disability to not be credible, the ALJ determined that the objective medical evidence did not support a finding of total disability. Specifically, the ALJ found that: (1) Following back surgery, McKinlay was able to return to work, (2) her 2004 examination by Dr. Mulderig showed no abnormal neurological findings in her left lower extremity, (3) even though she has degenerative disc disease in her cervical spine, she does not have any spinal canal compromise or other neural involvement and her neck pain is controlled by exercise, (4) she has full range of motion in her neck and normal upper extremity findings, (5) despite two arthroscopic knee surgeries, she has normal strength in her lower extremities and a normal gait, and (6) she does not require an assistive device to ambulate. Based on these findings, the ALJ concluded "the clinical findings associated with her impairments indicate that she has significant work-related limitations. However, the findings do not support her contention that she cannot do any kind of work at the competitive level." The ALJ also notes that her allegation of total disability is not supported by the opinions of any physicians who treated, examined or evaluated her.[9] Lastly, the ALJ found that McKinlay's daily activities, the ability to drive, perform household chores, and work a part-time job,[10] supports her conclusion that McKinlay's claim of total disability is not credible.

There is substantial evidence in the record to support the ALJ's conclusion that the objective medical evidence in this case does not support McKinlay's subjective allegation of total disability. The medical evidence in the record provides that McKinlay shows no

_____

[9] Essentially, the ALJ is asserting that none of McKinlay's treating, examining, or evaluating physicians concluded she could not work an eight-hour day. The ALJ specifically states: "Although Dr. Cairns stated in September 2003 that the claimant could not work more than four hours a day, he stated in June 2005 that he did not mean this, and that she could work an eight-hour day."

[10] The ALJ is referring to her job at St. Vincent De Paul Store, from February 18, 2002 to December 29, 2004.

abnormal neurological findings in her left lower extremity, her neck pain is controlled by exercise, she has full range of motion in her neck and normal upper extremity findings, and she has normal strength in her lower extremities and a normal gait. *See Gowell*, 242 F.3d at 796 (the absence of objective medical evidence is a relevant factor for an ALJ to consider when making a credibility determination for a claimant's subjective pain complaints). The ALJ also notes that none of McKinlay's treating, examining, or evaluating physicians concluded that she was totally disabled. The court finds that the record supports this conclusion. Therefore, based on the evidence as a whole, the conclusions of McKinlay's doctors are inconsistent with her own subjective conclusions regarding her impairments. Thus, the ALJ could properly discount McKinlay's subjective complaints. *See Pelkey*, 433 F.3d at 578 (subjective complaints may be discounted if inconsistencies exist in the evidence as a whole). The record further supports the ALJ's conclusion that inconsistencies between McKinlay's subjective complaints and her daily activities diminish her credibility. The ALJ noted that McKinlay drives and performs household chores, including washing dishes, vacuuming, and dusting. *See Forte v. Barnhart*, 377 F.3d 892, 896 (8th Cir. 2004) (finding the claimant's ability to drive and attend class inconsistent with his allegations of disabling pain). Moreover, the ALJ also noted that McKinlay worked part-time while she claimed to be totally disabled. Part-time work may demonstrate the ability to perform substantial gainful employment. *Harris*, 356 F.3d at 930 (citing *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992)).

The court finds that the ALJ properly discounted McKinlay's complaints because there were significant inconsistencies in the evidence as a whole and she properly gave reasons for discrediting McKinlay. *Pelkey*, 433 F.3 at 578. Therefore, the court will not disturb the ALJ's credibility determination. *Johnson*, 240 F.3d at 1147. After considering the weight of the evidence and balancing the factors supporting the ALJ's credibility determination against the factors in support of McKinlay's claim, the court finds that the ALJ's determination that McKinlay's allegation of total disability was not credible is supported by substantial evidence.

Assessment of the credibility of witness testimony lies within the province of the ALJ. *Siemers v. Shalala*, 47 F.3d 299, 302 (8th Cir. 1995). The ALJ is free to disbelieve testimony of a claimant and his or her witnesses. *Basinger v. Heckler*, 725 F.2d 1166, 1170 (8th Cir. 1984). However, "'the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding.'" *Id.* (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir. 1983)). Furthermore, if the ALJ rejects witness testimony, he or she must specifically discuss such testimony and express a credibility determination. *Smith v. Heckler*, 735 F.2d 312, 317 (8th Cir. 1984). Deference is given to an ALJ's witness credibility determination, if his or her determination is supported by good reasons and substantial evidence. *Vester*, 416 F.3d at 889 (citation omitted).

The ALJ found that Van Cleve's testimony was entitled to little weight in determining McKinlay's RFC because Van Cleve is not a medical doctor and therefore her opinion cannot be used to contradict the opinions of medical doctors who stated McKinlay could work an eight-hour day. The ALJ further noted that Van Cleve was the St. Vincent De Paul Store store manager and McKinlay worked in the store's warehouse. Thus, the ALJ found it unlikely that Van Cleve spent "a good deal of time actually observing the complainant perform her work." The ALJ also asserted that Van Cleve and McKinlay appeared to be friends and therefore could not exclude the possibility of bias on Van Cleve's part in favor of McKinlay. The ALJ also noted that Van Cleve provided her opinion shortly after McKinlay underwent right knee surgery and before she underwent left knee surgery. The ALJ concluded that "[i]t is reasonable to assume that the claimant had more pain and limitations in her functioning at this time than after she had recovered from both injuries." The court finds that the ALJ properly discounted Van Cleve's testimony because there were significant inconsistencies between her testimony and the evidence as a whole and the ALJ properly gave reasons for discrediting Van Cleve. *Pelkey*, 433 F.3 at 578. Therefore, the court will defer to the ALJ's credibility determination of Van Cleve's testimony. *Vester*, 416 F.3d at 889.

The court finds that the ALJ considered all of the relevant evidence in this case, including the medical records of McKinlay's treating, examining, and evaluating sources and McKinlay's own description of her conditions. *See Tellez*, 403 F.3d at 957. The ALJ's determination of McKinlay's RFC was influenced by her finding that McKinlay was not fully credible and that Dr. Cairns and Dr. Mulderig's opinions should be given less weight than the differing opinions of Dr. Wilson and Dr. Olsen. The ALJ's determination of the RFC is supported by substantial evidence and shall be affirmed.

### VI. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED**:

(1)     The final decision of the Commissioner of Social Security is **AFFIRMED**;

(2)     Plaintiff's Complaint (docket number 1) is **DISMISSED** with prejudice; and

(3)     The Clerk of Court is directed to enter judgment accordingly.

IT IS SO ORDERED.

DATED this 11th day of April, 2007.

_____
JON STUART SCOLES
Magistrate Judge
UNITED STATES DISTRICT COURT